## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF OREGON

## PORTLAND DIVISION

| | |
|---|---|
| **RICHARD RABBAT**, | Case No. 3:11-cv-1146-SI |
| Plaintiff, | |
| v. | **FINDINGS OF FACT AND CONCLUSIONS OF LAW** |
| **STANDARD INSURANCE COMPANY**, **LOUISIANA-PACIFIC CORPORATION SALARIED EMPLOYEES' LONG-TERM DISABILITY PLAN**, and **LOUISIANA-PACIFIC CORPORATION**, | |
| Defendants. | |

Megan E. Glor and John C. Shaw, Megan E. Glor, Attorneys at Law, PC, 621 S.W. Morrison, Suite 900, Portland, OR 97205. Of attorneys for Plaintiff.

Chrys A. Martin and P. Andrew McStay, Jr., Davis Wright Tremaine LLP, 1300 S.W. Fifth Avenue, Suite 2300, Portland, OR 97201. Of attorneys for Defendants.

**SIMON, District Judge**.

The Employee Retirement Income Security Act ("ERISA") provides that an ERISA plan "participant" may bring a civil action in federal court "to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan[.]" 29 U.S.C. § 1132(a)(1)(B). Plaintiff Richard Rabbat ("Mr. Rabbat") brings this action to challenge the decision made by Defendants Standard Insurance Company ("The Standard"), Louisiana-Pacific Corporation Salaried Employees' Long-Term Disability Plan, and Louisiana-Pacific Corporation ("LP") (collectively "Defendants") denying him long-term disability ("LTD") benefits under the Louisiana-Pacific

Corporation Salaried Employees' Long-Term Disability Plan (the "Plan"). Mr. Rabbat, who worked as a computer help desk technician for LP, argues that he is totally disabled under the terms of the Plan due to Familial Mediterranean Fever, an incurable disorder causing him severe chronic pain. Defendants argue that the medical evidence and Mr. Rabbat's work history do not establish that Mr. Rabbat is totally disabled. For the reasons described below, the court concludes that Mr. Rabbat is entitled to long-term disability benefits under the terms of the Plan.

## PROCEDURAL ISSUES

Before turning to the merits of the parties' arguments, the court must determine whether to resolve this case on the parties' cross motions for summary judgment (Dkts. 24 and 26) or on a trial on the administrative record. The answer depends on what standard of review the court applies. "ERISA does not set out the appropriate standard of review for actions under § 1132(a)(1)(B) challenging benefit eligibility determinations." *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 109 (1989). The Supreme Court, therefore, has prescribed a simple test to determine what standard of review a district court should apply. If the benefits plan provides the plan administrator with "discretionary authority to determine eligibility for benefits," *id.* at 115, review is for abuse of discretion. *Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 111 (2008). If the plan does not provide the plan administrator with such authority, however, review is *de novo*. *Id.* Here, the Plan provides that "the Plan Administrator has the discretionary authority to determine eligibility for benefits[.]" Administrative Record ("AR") at 59. Nonetheless, the parties have stipulated to *de novo* review. Dkt. 16. The court accepts the parties' stipulation and reviews the record *de novo*. *See Rorabaugh v. Cont'l Cas. Co.*, 321 Fed. App'x 708, 709 (9th Cir. 2009) (court may accept parties' stipulation to *de novo* review).

The parties have filed cross motions for summary judgment. Dkts. 24 and 26. The Ninth Circuit has often held that in an ERISA benefits case, where the court's review is for abuse of discretion, summary judgment is a proper "conduit to bring the legal question before the district court." *Bendixen v. Standard Ins. Co.*, 185 F.3d 939, 942 (9th Cir. 1999), *overruled on other grounds by Abatie v. Alta Health & Life Ins. Co.*, 458 F.3d 955, 965 (9th Cir.2006) (*en banc*) ("Where the decision to grant or deny benefits is reviewed for abuse of discretion, a motion for summary judgment is merely the conduit to bring the legal question before the district court and the usual tests of summary judgment, such as whether a genuine dispute of material fact exists, do not apply."); *see also Harlick v. Blue Shield of California*, 686 F.3d 699, 706 (9th Cir. 2012) (same).

Where, however, review is under the *de novo* standard, the Ninth Circuit has not definitively stated whether summary judgment is the appropriate vehicle for resolution of an ERISA benefits claim. There are reasons to think that it is not. The *de novo* standard requires the court to make findings of fact and weigh the evidence. *See Walker v. Am. Home Shield Long Term Disability Plan*, 180 F.3d 1065, 1069 (9th Cir. 1999) (*de novo* review applies to plan administrator's factual findings as well as plan interpretation). Yet, when deciding a motion for summary judgment, the court is forbidden to make factual findings or weigh evidence. *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987) (court may not make factual findings, make credibility determinations, or weigh evidence on review of motion for summary judgment).

There is, however, an alternative to resolving an ERISA benefits case on summary judgment: the court may conduct a trial on the administrative record. *Kearney v. Standard Ins.*

*Co.*, 175 F.3d 1084, 1095 (9th Cir. 1999) ("the district court may try the case on the record that the administrator had before it"). In a trial on the administrative record:

> The district judge will be asking a different question as he reads the evidence, not whether there is a genuine issue of material fact, but instead whether [the plaintiff] is disabled within the terms of the policy. In a trial on the record, but not on summary judgment, the judge can evaluate the persuasiveness of conflicting testimony and decide which is more likely true.

*Id.* Thus, when applying the *de novo* standard in an ERISA benefits case, a trial on the administrative record, which permits the court to make factual findings, evaluate credibility, and weigh evidence, appears to be the appropriate proceeding to resolve the dispute. *See Casey v. Uddeholm Corp.*, 32 F.3d 1094, 1099 (7th Cir. 1994) (on *de novo* review of an ERISA benefits claim, the "appropriate proceeding[] . . . is a bench trial and not the disposition of a summary judgment motion"); *Lee v. Kaiser Found. Health Plan Long Term Disability Plan*, 812 F. Supp. 2d 1027, 1032 (N.D. Cal. 2011) ("*De novo* review on ERISA benefits claims is typically conducted as a bench trial under Rule 52."); *but see Orndorf v. Paul Revere Life Ins. Co.*, 404 F.3d 510, 517 (1st Cir. 2005) ("When there is no dispute over plan interpretation, the use of summary judgment . . . is proper regardless of whether our review of the ERISA decision maker's decision is *de novo* or deferential.").

Notwithstanding the parties' motions for summary judgment, the court elects to resolve the parties' dispute in a bench trial on the administrative record rather than on summary judgment. At oral argument, all parties consented to this approach. Pursuant to Fed. R. Civ. P. 52(a), therefore, the court issues the following findings and conclusions.

## DISCUSSION

### I.    Findings of Fact

1.    Mr. Rabbat is approximately 46 years old. At the age of 13, Mr. Rabbat was diagnosed with Familial Mediterranean Fever ("FMF"). AR 215, 514. FMF is a "disorder in which patients suffer repeated febrile[1] illnesses without evidence of infection . . . Symptomatic attacks typically begin around the ages 5 to 15, often consisting of fever, joint pains, abdominal pain . . . and rashes[.] Duration and frequency of the attacks can be unpredictable." TABER'S CYCLOPEDIC MEDICAL DICTIONARY 846 (Donald Venes et al. eds. 2009).

2.    Medical records dating back to 2000 (the earliest in the administrative record), demonstrate that Mr. Rabbat suffers from chronic pain linked to FMF. *See, e.g.*, AR 175, 218, 244, 252, 502, 511-12, 514-15. Mr. Rabbat been prescribed a variety of anti-inflammatory and narcotic medication to control his pain. *See, e.g.*, AR 171, 415. One rheumatologist,[2] Dr. Vandana Khurma, noted in 2007 that "[l]ocal injections to [Mr. Rabbat's] joints have destroyed them." AR 215.

3.    Before he began working for LP, Mr. Rabbat received Social Security disability benefits.[3] AR 162, 484.

---

[1]    "Febrile" means pertaining "to fever; feverish." TABER'S CYCLOPEDIC MEDICAL DICTIONARY 852 (Donald Venes et al. eds. 2009).

[2]    Rheumatology is the "study and treatment of connective tissue and joint diseases." TABER'S CYCLOPEDIC MEDICAL DICTIONARY 2036 (Donald Venes et al. eds. 2009).

[3]    The record does not contain any documentation from the Social Security Administration showing when Mr. Rabbat began receiving disability benefits or on what basis the Social Security Administration decided to award benefits to him. The only evidence that Mr. Rabbat received benefits before working for LP is recorded on an October 2008, treatment note and in a letter sent from his attorney to The Standard. AR 162, 484.

4.      In May 2005, LP hired Mr. Rabbat to work as a help desk technician in its Vancouver

office. AR 383. In that position, Mr. Rabbat fielded phone calls and resolved software

and hardware issues, created technical documents, and managed e-mail accounts.

AR 331, 682. Johnny Stone, III, Mr. Rabbat's supervisor, wrote in a statement that

Mr. Rabbat was "good at his job and had a strong work ethic." AR 682.

5.      Even while working at LP, Mr. Rabbat frequently sought medical attention for his FMF.

Medical record from 2008 demonstrate that several doctors observed Mr. Rabbat to be

suffering from pain, swelling, redness, and blisters associated with FMF. On February 7,

2008, for example, Dr. Geoffrey Gordon, a pain management specialist, noted that both

of Mr. Rabbat's "ankles are swollen, warm, red[.]" AR 197. Mr. Rabbat reported that he

was awake more than half the night with pain. *Id.* On April 2, 2008, Dr. Gordon noted

that Mr. Rabbat had a "persistent flare of FMF that has been going on more than a month,

involved knees and ankles, then left elbow, now left shoulder[.]" AR 192. On August 22,

2008, Mr. Rabbat's treating physician, Dr. Annette Guido, noted that Mr. Rabbat's FMF

"flared 3 days ago." AR 175. She observed that Mr. Rabbat's "calves are red, swollen,

tender. Blisters." *Id.* On September 7, 2008, Dr. Steven Levine reported that in the "last

few days[, Mr. Rabbat] has developed a painful red erup[tion] on the back of both

thighs[.]" AR 169. Dr. Levine added that Mr. Rabbat was suffering "signif[icant] acute

pain [due to] this flare." AR 170. On October 9, 2008, Dr. William Melcher, a

rheumatologist, reported that Mr. Rabbat "has had worsening fever and knee and ankle

arthritis; . . . exam today shows significant arthritis especially at right knee and left

ankle[.]" AR 165-66.

6.      Mr. Rabbat continued to suffer from FMF flares in 2009. On January 5, Dr. Steven Jones observed that Mr. Rabbat had swelling in the left leg and noted that Mr. Rabbat had "limb pain," likely "related to FMF." AR 207. On February 5, 2009, Dr. Melcher reported that Mr. Rabbat continues "to have a lot of knee and ankle arthritis[.]" AR 606. Dr. Melcher observed "chronic bilateral swelling" in Mr. Rabbat's ankles, and poor range of motion in his left shoulder. *Id.* In March 2009, Dr. Michael Ferrell became Mr. Rabbat's internist. AR 548. Dr. Ferrell observed that Mr. Rabbat's right knee was swollen and warm and Mr. Rabbat had trouble walking. AR 548-49.

7.      The record also contains extensive evidence demonstrating that Mr. Rabbat became dependent on opioid pain medication. Because Mr. Rabbat was seeking early re-fills for his pain medication and taking more than the prescribed doses, Dr. Guido referred Mr. Rabbat for an addiction medicine consultation in December 2008. AR 162-63, 254-56. In an assessment dated December 10, 2008, an addiction medicine counselor found that Mr. Rabbat abused Oxycontin, a prescription opioid pain medicine, by using it to "medicate[] emotional pain." AR 255. Throughout the early months of 2009, and in particular in mid-February, Mr. Rabbat continued to seek early refills of Oxycontin. AR 578-604. Dr. Guido eventually decided to stop prescribing Mr. Rabbat opioids. AR 581. In February 2009, Dr. Gordon wrote that Mr. Rabbat "has active inflammatory arthritis, depression, marital and occupational stress. These conditions are chronic[.] . . . They do not justify his consistently taking more [O]xycontin than is prescribed. I escalated doses during the time I cared [for] him and his pain levels were no better at higher doses than they were at the current doses." AR 581. Mr. Rabbat began a methadone and counseling program to treat his dependency. AR 539. In a treatment note

from April 2009, a counselor noted that Mr. Rabbat had missed two addiction counseling

sessions. AR 537.

8.      Over the course of his employment at LP, Mr. Rabbat missed work due to symptoms

from FMF on an increasingly frequent basis. In 2006, he missed 18 days of work. In

2007, he missed 22 days.[4] In 2008, in the nine months before he stopped working, he

missed 27 days. AR 653-74.

9.      Mr. Stone, Mr. Rabbat's former supervisor at LP, stated that Mr. Rabbat's illness made it

"increasingly difficult" for him to complete his job duties. Mr. Stone wrote:

> I cannot recall a day in the last year when I worked with [Mr. Rabbat] when his
> legs were not swollen to three times their normal size and were very purple. The
> entire last 12 months that I worked with [Mr. Rabbat], I could see he was in great
> pain. . . . On many occasions I sent him home because he was sweating profusely,
> either from running a fever or because of severe pain. On the days Richard was
> limping due to pain to his legs and ankles, I observed more sweating. Most days
> [Mr. Rabbat] would rest/sleep in his car during lunch. During the last year
> [Mr. Rabbat] was employed at LP, I sent him home on several occasions because
> he seemed to be unable to concentrate due to pain and discomfort.

AR 682.

10.     Mr. Rabbat stopped working on October 3, 2008,[5] and applied for short-term disability

benefits. AR 299. Defendants awarded Mr. Rabbat's short-term disability benefits.

AR 315-16. Those benefits expired on April 3, 2009. AR 386.

11.     On November 1, 2008, Mr. Rabbat applied for long-term disability ("LTD") benefits

under LP's long term disability plan. AR 299. LP is the Plan administrator. AR 46. LP

---

[4]  Mr. Rabbat notes that he missed 27 days of work in 2007. Pl.'s Memo in Support at 4.
As Defendants point out, however, Mr. Rabbat missed five of these days to undergo a surgical
procedure unrelated to FMF. Defs.' Resp. at 4 n.1; *see* AR 247.

[5]  Some documents in the record list Mr. Rabbat's last day as October 2, 2008. AR 299,
386.

has contracted with The Standard to provide administrative services, such as reviewing,

investigating, and processing claims. AR 63-93.

12. The Plan provides that if "a period of Total Disability of a Participant commences while

the Participant is covered under this Plan and continues during and beyond the Qualifying

Period . . . the Plan shall . . . pay a monthly benefit during the continuance of the period

of Total Disability." AR 51. According to the Plan, "total disability" or "totally disabled"

means that

>the Participant is under the care of a Physician and [*sic*] because of an illness,
>injury or other medical condition and:
>
>(i)    For the first 24 months of Disability Income Benefits, is unable to perform
>the usual duties of his or her regular occupation.
>
>(ii)    After the first 24 months of Disability Income Benefits, is unable to
>perform the usual duties of any occupation for which he or she is qualified
>or may become qualified based on his or her education, training or
>experience.

AR 50.

13. Dr. Guido, Mr. Rabbat's internist, completed two forms provided by The Standard. In

one, a one-page form titled "Disability Insurance-Attending Physician's Statement,"

Dr. Guido indicated that she found Mr. Rabbat permanently disabled due to FMF.

AR 312. Dr. Guido also noted that she recently observed "significant arthritis especially

at right knee and left ankle." *Id.* Dr. Guido did not fill out a section of the form regarding

Mr. Rabbat's ability to sit and walk for certain lengths of time and carry and lift certain

weights. *Id.* In an accompanying e-mail sent to The Standard, Dr. Guido wrote that

"Perm[anent] disability makes sense for" Mr. Rabbat. AR 311.

14.    In a second, multiple-page form, titled "Ortho/Neuro Questionnaire," Dr. Guido
diagnosed Mr. Rabbat with FMF and chronic pain. AR 337-39. Dr. Guido wrote that her
physical findings included joint swelling. *Id.* In a section labeled "Anticipated return to
work date," Dr. Guido wrote "Never." AR 339. She added in the comments section
"Permanent and Total disability as of 10/3/08." *Id.*

15.    Dr. Bradley Fancher, an independent physician consultant for The Standard, reviewed
Mr. Rabbat's file on January 14, 2009, but did not personally examine him. AR 348-51.
In his written report, Dr. Fancher noted that Mr. Rabbat had been diagnosed with FMF.
AR 348. Dr. Fancher also wrote that Mr. Rabbat "did not appear to be receiving any
active treatment for his condition." Dr. Fancher further noted that Mr. Rabbat "had
become addicted to opioids." *Id.* Dr. Fancher found that Mr. Rabbat "has been working
with [FMF] for some time. There is no indication in the medical records that
[Mr. Rabbat's] condition changed at the time that he ceased working." *Id.* Dr. Fancher
concluded that "I can find no documentation in the medical record that [Mr. Rabbat]
would be impaired from performing sedentary, light, or medium level work on a full-time
basis from the time the claimant ceased work to the present time." *Id.*

16.    Dr. Ronald Fraback, The Standard's medical director, also provided a physician
consultant memorandum for The Standard. AR 431-36. Like Dr. Fancher, Dr. Fraback
reviewed Mr. Rabbat's file, but did not personally examine Mr. Rabbat. AR 431-33.
Dr. Fraback noted that Mr. Rabbat "has a long history of [FMF] with associated
inflammatory arthritis. He has been taking large amounts of opioid therapy." AR 433.
Dr. Fraback concluded that Mr. Rabbat "has apparently worked with this condition in a
sedentary-level position for many years. I do not find clear evidence that his condition

worsened to the point where he could not perform sedentary-level work as of the cease-work date." AR 433.

17.    Defendants denied Mr. Rabbat's LTD claim. AR 446-51. The Standard concluded that Mr. Rabbat was "reasonably capable of working on a full-time basis in a Sedentary Level Work setting[.]" AR 449. The Standard also concluded that, "although [Mr. Rabbat's] medical condition of [FMF] causes some arthritic symptoms in [his] lower extremities, there is no indication that [his] condition worsened to the point where [he] would not be able to perform sedentary level [work] at the time [he] ceased work to present." AR 449-50.

18.    Mr. Rabbat requested that The Standard review its decision, and he submitted additional medical records, witness statements, and legal materials. AR 465, 476-712.

19.    Mr. Rabbat submitted a letter from Dr. Michael Ferrell, who became Mr. Rabbat's internist in March 2009. AR 489-90, 548. In a letter prepared for Mr. Rabbat's disability claim, Dr. Ferrell wrote that during an FMF "flare," Mr. Rabbat "experiences significant pain and swollen joints and blisters. The swelling in his joints causes Mr. Rabbat great difficulty in walking." AR 489. Despite a variety of ameliorative treatments, "Mr. Rabbat continues to experience severe swelling. There is not much more that can be done to alleviate his swelling." *Id*. Dr. Ferrell noted that at times "Mr. Rabbat's joints will remain swollen for extended periods of time." In addition to swelling, Dr. Ferrell wrote that "Mr. Rabbat's condition causes him severe pain[.] . . . His pain can range anywhere from 5 to 9 and typically is at a level of 7." *Id.* In light of his condition, Dr. Ferrell concluded that "Mr. Rabbat is disabled from working on a predictable and regular basis. The nature of Mr. Rabbat's condition is such that he experiences constant daily pain as

well as frequent, unpredictable attacks. . . Mr. Rabbat's pain is of such a severity that it makes it difficult for him to function in even a sedentary capacity." AR 490.

20. According to Mr. Rabbat's attorney, in 2009 Mr. Rabbat reapplied for Social Security disability benefits and was approved. AR 484, 548. The record does not contain a copy of Mr. Rabbat's application or the Social Security Administration award letter. The court, however, accepts Mr. Rabbat's representation that Mr. Rabbat is currently receiving Social Security disability benefits.

21. As part of The Standard's administrative review process, Dr. Ibrahim Alghafeer, a rheumatologist, performed an independent review of Mr. Rabbat's medical records. AR 718-24. Dr. Alghafeer did not examine Mr. Rabbat. *Id.* According to Dr. Alghafeer, the "medical information does not support that Mr. Rabbat has frequent flares of his" FMF. AR 723. Instead, the "bulk of the medical records reviewed describe refills on his pain medications and his drug overuse behavior rather than FMF flares. The documentation of FMF flares has been limited." AR 723. Dr. Alghafeer concluded that the "submitted data does not preclude Mr. Rabbat from performing sedentary level work on a full-time basis as of 10/2/08 and beyond[.]" AR 724.

22. On review of their initial decision, Defendants again denied Mr. Rabbat's claim for LTD benefits. AR 735-53. In a letter explaining the decision, The Standard wrote that review of Mr. Rabbat's medical records "by three Physician Consultants supports that Mr. Rabbat's condition did not change significantly around the time of his cease work date or after." AR 749. The Standard attributed many of Mr. Rabbat's complaints of severe pain to attempts to obtain additional opioid pain medication: "The medical records support that Mr. Rabbat made frequent complaints of pain in order to obtain early refills

of his medications." AR 751. The Standard also explained that although Mr. Rabbat's
doctors noted that "Mr. Rabbat has had some tenderness and edema . . . on some exams,
most of his exams do not document any significant abnormalities." AR 752. The
Standard found that Mr. Rabbat is "most often described as alert, oriented and in no acute
distress." *Id.* The Standard concluded that it did "not find any significant findings that
would suggest that Mr. Rabbat experiences frequent flares of a severity to preclude him
from working in a sedentary level job on a full[-]time basis." *Id.*

## II.   Conclusions of Law

### A.   Standards

1.   The Employee Retirement Income Security Act ("ERISA") provides that an ERISA plan
"participant" may bring a civil action in federal court "to recover benefits due to him
under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify
his rights to future benefits under the terms of the plan." 29 U.S.C. § 1132(a)(1)(B);
*Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 108 (2008) (ERISA "permits a person denied
benefits under an employee benefit plan to challenge that denial in federal court.").

2.   As discussed above, ERISA does not set forth the appropriate standard of review for
actions challenging benefit eligibility determinations. *Firestone Tire & Rubber Co. v.
Bruch*, 489 U.S. 101, 109 (1989). The parties, however, have stipulated to *de novo*
review. Dkt. 16. The court accepts the parties' stipulation and reviews the record *de novo*.
*See Rorabaugh v. Cont'l Cas. Co.*, 321 F. App'x 708, 709 (9th Cir. 2009) (court may
accept parties stipulation to *de novo* review). "When conducting a *de novo* review of the
record, the court does not give deference to the claim administrator's decision, but rather
determines in the first instance if the claimant has adequately established that he or she is

disabled under the terms of the plan." *Muniz v. Amec Const. Mgmt., Inc.*, 623 F.3d 1290, 1295-96 (9th Cir. 2010).

3.      When a district court "reviews a plan administrator's decision under the *de novo* standard of review, the burden of proof is placed on the claimant." *Id.* at 1294; *see also Horton v. Reliance Standard Life Ins. Co.*, 141 F.3d 1038, 1040 (11th Cir. 1998) (the claimant "bears the burden of proving his entitlement to contractual benefits").

**B.      Mr. Rabbat Is Totally Disabled**

4.      To qualify as "totally disabled" under the Plan definition, Mr. Rabbat must first establish that he is "under the care of a Physician and [*sic*] because of an illness, injury or other medical condition." Next, he must establish that he is unable to perform the usual duties of his regular occupation and, after the first 24 months of receiving disability benefits, that he "is unable to perform the usual duties of any occupation for which he . . . is qualified or may become qualified based on his or her education, training or experience." AR 50. The parties do not dispute the meaning of the Plan's terms. Nor do they dispute that Mr. Rabbat is under the care of a physician because of an illness.

5.      Mr. Rabbat's short term disability benefits expired on April 4, 2009. For the period from April 5, 2009 until April 5, 2011, his first 24 months of eligibility, whether Mr. Rabbat is totally disabled depends on whether he was "unable to perform the usual duties of his or her regular occupation." For the period after April 5, 2011, whether Mr. Rabbat is totally disabled depends on whether he "is unable to perform the usual duties of any occupation for which he or she is qualified or may become qualified based on his or her education, training or experience." If Mr. Rabbat "is unable to perform the usual duties of any occupation for which he or she is qualified or may become qualified," he is also unable to

perform the duties of his "regular occupation." Thus, the only question for the court to decide is whether Mr. Rabbat "is unable to perform the usual duties of any occupation for which he or she is qualified or may become qualified based on his or her education, training or experience." For the reasons discussed below, the court finds that Mr. Rabbat has established that he meets the Plan's definition of "total disability."

### i.    Medical evidence of total disability

6.    Both of Mr. Rabbat's internists, who have personally examined and treated him, wrote that Mr. Rabbat is totally and permanently disabled. Dr. Guido twice submitted forms provided by The Standard on which she stated that Mr. Rabbat is totally disabled. She also wrote in an email to The Standard that "Perm[anent] disability makes sense for" Mr. Rabbat. AR 311. Dr. Ferrell wrote that "Mr. Rabbat is disabled from working on a predictable and regular basis. The nature of Mr. Rabbat's condition is such that he experiences constant daily pain as well as frequent, unpredictable attacks. . . Mr. Rabbat's pain is of such a severity that it makes it difficult for him to function in even a sedentary capacity." AR 490. This evidence alone is persuasive evidence that Mr. Rabbat is totally disabled. *See Salomaa v. Honda Long Term Disability Plan*, 642 F.3d 666, 676-79 (9th Cir. 2011) (evidence showing that the doctors who personally examined the claimant concluded that he was disabled, even though insurance company's non-examining physicians found otherwise, supported finding that the claimant was disabled under terms of the plan).

7.    Defendants contend that the opinions of Mr. Rabbat's doctors are not determinative because none of his doctors "assessed whether [Mr. Rabbat's] pain affected his functionality." Defs.' Response to Motion for Summary Judgment ("Defs.' Resp.") at 5

(Dkt. 38). Defendants are correct that Dr. Guido did not complete portions of The

Standard's forms that asked the signatory to rate the patient's functionality. Defs.'

Memorandum in Support ("Defs.'Mem.") at 12 (Dkt. 25). Even so, Dr. Guido found that

Mr. Rabbat was incapable of working. On a section of one form marked "Anticipated

return to work date," Dr Guido wrote "Never." AR 339. She also checked a box

indicating that she believed that Mr. Rabbat's condition would regress. *Id.* Thus, although

Dr. Guido did not rate Mr. Rabbat's functionality on The Standard's forms, she

unambiguously concluded that Mr. Rabbat was incapable of working and that his

condition would never improve.

8.      Moreover, contrary to Defendants' contention, Dr. Ferrell assessed Mr. Rabbat's

functionality. In his letter, he wrote that Mr. Rabbat

> would need to be absent from work due to the pain and swelling he experiences.
> . . . His pain medication, taken as directed, causes debilitating effects of
> grogginess and insomnia. The swelling in Mr. Rabbat's joints and his need to
> position himself with his extremities elevated make working even a sedentary
> position impossible.

AR 490. Dr. Ferrell's assessment is consistent with Mr. Rabbat's record of frequent

excused absences from work throughout 2007 and 2008, and Johnny Stone's description

of Mr. Rabbat's discomfort, grogginess, and difficulty concentrating. Together,

Drs. Guido and Ferrell's opinions are persuasive medical evidence that Mr. Rabbat is

totally disabled.

9.      Defendants also contend that most of the medical records concern Mr. Rabbat's opioid

pain medication dependency, not FMF and its symptoms. Defs.' Mem. at 11; Defs.'

Resp. at 5-8. To some extent, this is true. As described above, Mr. Rabbat developed a

dependency on opioid pain medication. In 2008 and 2009, and, in particular, between

February 9 and February 13, 2009, there are extensive records documenting Mr. Rabbat's attempts to obtain early refills of Oxycontin. AR 570-605.

10.    Nonetheless, the record demonstrates that Mr. Rabbat developed his narcotic dependency as a result of chronic, often severe pain. Dr. Ferrell explained that Mr. Rabbat's narcotic dependence "results from his debilitating FMF and would not have occurred were it not for his underlying severe condition." *Id.*

11.    Furthermore, narcotic dependency and chronic pain are not mutually exclusive conditions. Indeed, Dr. Ferrell noted that it is "common" for chronic pain patients to develop narcotic dependence. AR 489. In Mr. Rabbat's case, the medical record shows that Mr. Rabbat's doctors treated him for both opioid pain medication dependence and chronic, often severe pain. For example, Dr. Gordon wrote in a treatment note on February 12, 2009, that Mr. Rabbat's medical conditions "do not justify his consistently taking more [O]xycontin than is prescribed." AR 581. Nonetheless, Dr. Gordon recognized, in the same note, that Mr. Rabbat suffered from chronic inflammatory arthritis. *Id.* Dr. Ferrell continued to prescribe Oxycontin to Mr. Rabbat even in mid-2009, several months after Mr. Rabbat had been referred to addiction counseling. AR 523-24. Finally, Dr. Guido stated that Mr. Rabbat was permanently disabled even after she had referred him to addiction counseling. AR 163 (Dr. Guido provides referral to addictionology on October 30, 2008); AR 312 (Dr. Guido writes "permanent disability" on The Standard's "Attending Physician's Statement" on December 4, 2008); AR 339 (Dr. Guido writes "Total and Permanent Disability" on The Standard's Ortho/Neuro Questionnaire" on December 16, 2008). Thus, although Mr. Rabbat developed narcotic dependence, he nonetheless suffers from chronic, often severe pain. In

this case, the fact that most of the medical records address narcotic dependency does not diminish the medical evidence showing that Mr. Rabbat is disabled as a result of FMF and its resulting chronic pain.

12.   Defendants also contend that The Standard's independent reviewing physicians, Drs. Fancher, Fraback, and Alghafeer, provided a more reliable assessment of Mr. Rabbat's condition because they "reviewed the medical evidence with the proper inquiry in mind: whether [Mr. Rabbat's] condition changed on or around October 2008, when he ceased working, such that he was unable to perform the usual duties of his job." Defs.' Resp. at 9. Dr. Fancher wrote that it "is clear that there was no material change in the claimant's condition at the time he ceased work." AR 348. Dr. Fraback stated that "I do not find clear evidence that [Mr. Rabbat's] condition worsened to the point where he could not perform sedentary-level work as of the cease-work date." AR 433. Dr. Alghafeer concluded that the "medical information in the claim file does not support that there was any change in Mr. Rabbat's condition on or around 10/2/08." AR 723.

13.   Although there was not a significant or instantaneous change in Mr. Rabbat's condition in October 2008, the record shows that Mr. Rabbat's condition gradually worsened throughout 2008. In a note from October 9, 2008, Dr. Melcher wrote that "since last seen over a year ago[, Mr. Rabbat] has had worsening fever and knee and ankle arthritis[.]" AR 165. In addition, as described in the Findings of Fact above, there any many treatment notes from 2008 describing FMF flares, including swelling, tenderness, redness, and blisters. Mr. Rabbat frequently missed work due to excused absences in 2008. Furthermore, Mr. Rabbat's supervisor, Mr. Stone, stated that Mr. Rabbat's "FMF made performing his job duties increasingly difficult." AR 682.

14.     In any event, Mr. Rabbat need not demonstrate that his condition changed significantly

on or around October 2, 2008. In *Hawkins v. First Union Corp. Long-Term Disability*

*Plan*, 326 F.3d 914, 918 (7th Cir. 2003), the Seventh Circuit held that there is not "a

logical incompatibility between working full time and being disabled from working full

time[.]" The Seventh Circuit explained:

> A desperate person might force himself to work despite an illness that everyone
> agreed was totally disabling. . . . Yet even a desperate person might not be able to
> maintain the necessary level of effort indefinitely. [The claimant] may have
> forced himself to continue in his job for years despite severe pain and fatigue and
> finally have found it too much and given it up even though his condition had not
> worsened. A disabled person should not be punished for heroic efforts to work by
> being held to have forfeited his entitlement to disability benefits should he stop
> working.

*Id.* Although Mr. Rabbat's condition did not dramatically change in October 2008, his

increasing record of absences, the medical records from 2008, and Dr. Melcher's

treatment note all suggest that Mr. Rabbat's condition deteriorated in the months leading

up to his decision to stop working and apply for benefits.

15.     Defendants also contend that ERISA does not require the court to accord special weight

to the opinions of treating physicians, such as Drs. Guido and Ferrell. Defs.' Mem. at 13;

Defs.' Resp. at 8. This is correct. In *Black & Decker Disability Plan v. Nord*, 538 U.S.

822 (2003), the Supreme Court found that courts could not impose a "treating physician

rule" on ERISA plan administrators similar to Social Security Administration rule

requiring adjudicators to afford greater weight to examining and treating doctors. *Id.*

at 834 ("courts have no warrant to require [plan] administrators automatically to accord

special weight to the opinions of a claimant's physician"); *see* 20 C.F.R. §§ 404.1527(c);

416.927(c) (regulations explaining how Social Security Administration weighs medical

opinions). Although *Black & Decker* holds that no special deference is required, "this

does not mean that a district court, engaging in a *de novo* review, cannot evaluate and give appropriate weight to a treating physician's conclusions, if it finds these opinions reliable and probative." *Paese v. Hartford Life & Acc. Ins. Co.*, 449 F.3d 435, 442 (2d Cir. 2006); *see also Black & Decker*, 538 U.S. at 832 ("it may be true that treating physicians, as a rule, have a greater opportunity to know and observe the patient as an individual" (internal quotation marks, citation, and alterations omitted)). In Mr. Rabbat's case, the court finds that Drs. Guido and Ferrell's treating relationship with Mr. Rabbat allowed them personally to observe the effects of Mr. Rabbat's FMF and assess the credibility of his reports of pain. Both doctors examined Mr. Rabbat multiple times—in Dr. Guido's case, over many years. In contrast, none of The Standard's three consulting physicians personally examined Mr. Rabbat and none could observe either the effects of his FMF on his ability to function or assess the credibility of his reports of pain. Given the complex medical issues surrounding case—involving both chronic pain and narcotic dependency—the court finds that Drs. Guido and Ferrell's medical opinions are more reliable and probative of Mr. Rabbat's condition than the consulting physician reports.

### ii.     LP Supervisor Johnny Stone's statement

16.     In addition to the medical evidence, the statement provided by Johnny Stone, III, Mr. Rabbat's former supervisor at LP, is persuasive evidence that Mr. Rabbat is totally disabled. As described above, Mr. Stone observed that Mr. Rabbat often appeared to be in severe pain and was, on "many occasions," sweating and running a fever. AR 682. Mr. Stone also observed that Mr. Rabbat was groggy, sometimes limped, and was unable to find a comfortable position at his work station. *Id.* Mr. Stone added that during "the last year [Mr. Rabbat] was employed at LP, I sent him home on several occasions

because he seemed to be unable to concentrate due to pain and discomfort." *Id.* Mr. Stone's statement, in combination with Mr. Rabbat's record of frequent and increasing absences from work, establishes that Mr. Rabbat was unable to perform the functions of his former occupation. Mr. Stone's statement is also persuasive evidence that Mr. Rabbat is unable to perform the duties of any occupation for which is qualified or could become qualified.

### iii.    Social Security disability award

17.    Finally, although not dispositive, the Social Security Administration's award of disability benefits to Mr. Rabbat is probative evidence that Mr. Rabbat it totally disabled. Social Security disability awards "are evidence of disability." *Salomaa*, 642 F.3d at 679. This is true even where, as here, the administrative record does not contain a copy of the award letter so that the plan administrator can review the SSA's reasoning. *See DeLisle v. Sun Life Assur. Co. of Canada*, 558 F.3d 440, 446 (6th Cir. 2009) ("Even though Sun Life did not have the opinion accompanying the notice of award, it still was well aware of the uniform federal standard that applies to Social Security claims."). The fact that the SSA awarded Mr. Rabbat disability benefits twice, both before and after he worked for LP, is further evidence that Mr. Rabbat is totally disabled.

18.    In aggregate, the evidence described above demonstrates that Mr. Rabbat suffers from chronic, often severe pain due to FMF. That pain makes it difficult for Mr. Rabbat to attend work on a reliable and consistent basis, and, when at work, concentrate on his duties. The court concludes, therefore, that Mr. Rabbat is unable to perform the duties of his former position and the duties of any occupation for which Mr. Rabbat is qualified or may become qualified.

### C.    Interest Rate

19.    Mr. Rabbat requests that the court order Defendants to pay pre-judgment interest at Oregon's statutory rate of nine percent per year, Or. Rev. Stat. § 82.010, rather the much lower rate prescribed in 28 U.S.C. § 1961. Pl.'s Mem. at 28. Generally, "'the interest rate prescribed for post-judgment interest under 28 U.S.C. § 1961 is appropriate for fixing the rate of pre-judgment interest unless the trial judge finds, on substantial evidence, that the equities of that particular case require a different rate.'" *Blankenship v. Liberty Life Assur. Co. of Boston*, 486 F.3d 620, 628 (9th Cir. 2007) (quoting *Grosz-Salomon v. Paul Revere Life Ins. Co.*, 237 F.3d 1154, 1164 (9th Cir. 2001)). In *Blankenship*, the district court awarded pre-judgment interest at a rate higher than prescribed in 28 U.S.C. § 1961 based on evidence showing that in the absence of disability payments the claimant was forced to rely on personal funds to pay living expenses. Had the claimant not used those personal funds to pay living expenses, the claimant would have invested the personal funds in a mutual fund that had a high rate of return. *Id.* The Ninth Circuit concluded that this evidence satisfied the requirement for substantial evidence showing that the equities of the case required a different interest rate. *Id.* Such evidence, however, is absent in this case. In fact, Mr. Rabbat has not set forth any evidence demonstrating that the equities require this court to deviate from the rate prescribed in 28 U.S.C. § 1961. The court, therefore, awards pre-judgment interest at the rate prescribed in 28 U.S.C. § 1961.

### CONCLUSION

The court construes Mr. Rabbat's motion for summary judgment, Dkt. 26, and Defendants' cross motion for summary judgment, Dkt. 24, as motions for judgment pursuant to Fed.R.Civ.P. 52. The court **DENIES** Defendants' motion for judgment, Dkt. 24. The court

**GRANTS IN PART** Mr. Rabbat's motion for judgment, Dkt. 26, as follows: The court

**DECLARES** that Mr. Rabbat is entitled to long-term disability benefits under the terms of the

Plan. The parties shall meet and confer to address the specific amount of back benefits, as well as

reasonable attorneys' fees and costs to be awarded. The parties shall submit a stipulated

proposed form of judgment. If the parties are unable to reach agreement on these issues within

30 days of this Order, Mr. Rabbat shall file a motion setting forth any issues that remain to be

resolved by the court.

IT IS SO ORDERD.

Dated this 1st day of October, 2012.

/s/ Michael H. Simon
_____

Michael H. Simon
United States District Judge